Filed 1/13/14  PG Inn, Inc. v.Gatward CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| PG INN, INC.,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRIS GATWARD et al.,<br><br>    Defendants and Appellants. | 2d Civil No. B248589<br>(Super. Ct. No. 56-2012-00428313-<br>CU-DF-VTA)<br>(Ventura County) |

Chris Gatward (Gatward) and M3 Environmental Consulting, LLC (M3) appeal an order denying a special motion to strike PG Inn, Inc.'s (PG Inn) complaint for libel pursuant to the anti-"SLAPP" (strategic lawsuit against public participation) statute. (Code Civ. Proc., § 425.16, subd. ( b)(1).)[1]  We conclude the complaint did not arise from the exercise of protected speech and that PG Inn established a probability of prevailing on the merits.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Gatward is the principal of M3.  In 2009, M3 performed airborne mold spore testing in the basement of the Pacific Grove Inn (the Inn) pursuant to a contract with the Inn's former manager, Jolie Quest Hotels.  PG Inn subsequently purchased the Inn.

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise stated.

In 2012, PG Inn filed a complaint against Gatward and M3 for "Libel - Defamation Per Se." PG Inn alleges that, in March 2012, Gatward maliciously published false statements on Yelp.com and TripAdvisor.com, stating that there was a severe mold problem in PG Inn's basement that was never remediated.

In the 2012 postings, Gatward wrote, "Although I have not stayed here, this review is more about the hotel management company (Jolie Quest) than the local staff. [¶] We were asked to perform mold testing at the inn in 2009 and found a severe problem, largely in the basement area . . . . We were asked back several times to test for mold spores as the management (Jolie Quest) tried to perform their own remediation, to no good effect. [¶] To make matters worse they did not pay for our services, and do not [return] calls or e-mails. The local manager is new and while seems nice, has been unable to help. [¶] So as far as we know, the mold problem still exists, and the company are dead beats."

Gatward and M3 filed an anti-SLAPP motion, asserting that PG Inn's complaint arose from constitutionally protected activity because it was brought in response to M3's efforts to obtain a small claims judgment for unpaid fees and in response to Gatward's expression of opinions on an issue of public concern, failure to remediate mold. (§ 425.16, subd. (b)(1) & (e)(2), (3).) Gatward and M3 also argued that PG Inn could not establish a probability of prevailing on the merits because Gatward's statements were either opinion or were substantially true.

In support of the motion to strike, Gatward presented copies of M3's November 2009 contract with Jolie Quest Hotels to perform mold and asbestos testing at the Inn; M3's November 2009 letter reporting its initial findings and recommendations; M3's January 2010 letter reporting the results of follow-up testing; and an April 2012 small claims judgment and complaint against Jolie Quest Hotels for about $2,000 in unpaid fees. It is undisputed that M3 obtained this judgment by default and that it was not satisfied.

M3's November 2009 letter after initial testing reported high airborne mold spore concentrations in the basement of the Inn's main building as compared to outdoor

2.

air samples. M3's visual inspection disclosed various areas of water damage and visible mold. M3 concluded, "Analytical results of the bioaerosol sampling as well as the visual inspection conducted during this evaluation do suggest a significant airborne mold spore concentration is present in [the] basement of the Main Building, the basement of the Back House, and water intrusion around the bathtub wall in Room 14 of the Back House." M3 recommended six remedial actions involving cleaning, removal, and further inspection. It recommended that any mold discovered on wood in wall cavities be sanded, cleaned and dried and that work be performed by an experienced mold remediation contractor and followed by further testing.

M3's January 2010 letter after follow-up testing reported that there were no longer any indoor spore concentrations in the basement above outdoor levels. It described these findings as typical of a "well-maintained building." This letter was written two years before Gatward's Internet postings. M3 wrote that "spore concentrations found in the indoor areas were lower than outdoor" concentrations in all cases, "with similar relative concentrations of mold species dominating the samples." In a section labeled "Observations," M3 noted a "clogged" sink in a maintenance area and "[v]isible water damage and suspect mold" still on the ceiling of a "refrigerator room" and also along the base of the wallboard in a closet under a stairway, not previously noted. But in its "conclusions," M3 reported, "Analytical results of the bioaerosol sampling as well as the visual inspection conducted during this evaluation do not suggest a significant airborne mold spore concentration is still present in [the] basement of the Main Building." The 2010 recommendations omitted five of the six original substantive recommended actions. M3 continued to recommend sanding, cleaning, and drying of the refrigerator room ceiling, and added recommendations to unclog and clean the sink and to remove the "mold impacted wallboard walls along the base of the stairway closet" in order to inspect the interior wall cavity "for possible mold growth."

In support of the motion to strike, Gatward declared that as of January 2010, "[he and M3] understood that PG [Inn] had not retained an experienced mold remediation contractor but, instead, attempted to do the work themselves"; that after

3.

issuing the January 2010 report, "[he and M3] were never called back to the premises of PG Inn"; that, as far as he knew, no further testing was ever done; and that "PG Inn has yet to pay and has not satisfied the judgment of $2,136.52." The contract, small claims complaint, and judgment attached to his declaration show that Jolie Quest Hotels, not PG Inn, was the party responsible for payment for M3's services. Gatward also submitted copies of three TripAdvisor.com posts from 2010, 2011, and 2012 describing the basement as dark, smelly, or dank (April 16, 2010: "Room #1 is in the basement! It is very dark and it was also smelly . . . ."; June 27, 2011: "Room a little dank/stuffy"; and April 17, 2012: "[W]hen you don't have a reservation that [*sic*] sticks you in the dungeon below").

PG Inn opposed the special motion and submitted copies of M3's 2010 report and Gatward's 2012 postings on Yelp.com and TripAdviser.com, quoted above. PG Inn also submitted the declaration of a shareholder of PG Inn, Gary Peterson, who oversaw the Inn's remediation efforts between M3's 2009 and 2010 inspections. Peterson described his experience with mold remediation and declared that there was no mold problem at the Inn after M3's final report. He also declared that Yelp and TripAdvisor took down Gatward's postings "immediately" after PG Inn contacted them, "but the economic damages had already begun to take effect"; and "[s]ince the reviews were posted, the Pacific Grove Inn suffered a dramatic loss in guest stays, which has translated into a loss of revenue and loss of value of the building itself.

The trial court denied Gatward and M3's motion to strike, ruling that they had not shown that Gatward's statements fell under the protection of section 425.16 and that PG Inn demonstrated a probability of prevailing. The court reasoned that the ability of a management company to pay its bills is not a matter of public concern, the existence of any mold problems at the Inn would concern a small number of people, and that PG Inn demonstrated it could prove the statements were false.

## DISCUSSION

Gatward and M3 contend that PG Inn's complaint arose from protected activity because Gatward's statements were made in a public forum concerning a public

issue and because they were made in connection with an issue under consideration by a court in his small claims collection action.  They also contend that PG Inn did not establish a probability of prevailing because the statements were not provably false and it did not offer evidence of pecuniary damage.

We review an order granting or denying a motion to strike under section 425.16 de novo.  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)  Section 425.16, subdivision (b)(1) provides:  "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  Protected activities include statements "made in connection with an issue under consideration or review by a . . . judicial body" (*id.*, subd. (e)(2)), and statements "made in a . . . public forum in connection with an issue of public interest" (*id.*, subd. (e)(3)).

Our analysis involves two steps:  First, we decide whether Gatward and M3 have made a threshold showing that PG Inn's complaint arises from protected activity.  (§ 425.16, subd. (b)(1).)  If so, we consider whether PG Inn has not demonstrated a probability of prevailing on its claim.  "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute . . . is a SLAPP, subject to being stricken under the statute."  (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.)

*Protected Activity*

Gatward's statement, "To make matters worse they did not pay for our services," was arguably made in connection with issues under review by the court in his small claims case.  But PG Inn's complaint did not arise from that statement.  The statement is included in a copy of the postings attached to its complaint, but PG Inn alleged no false statements about nonpayment.  Where allegations about protected conduct are merely incidental to unprotected conduct, the first prong is not met.  (*Peregrine Funding Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133

Cal.App.4th 658, 672; *Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 308.)

PG Inn alleged that Gatward falsely stated that "there was a severe mold problem in [the] Inn's basement and also stated that the problem was never remediated." Gatward offered no evidence that mold remediation was an issue under review in the small claims case and his small claims complaint suggests it was not. It was an action to collect fees for a testing contract. The contract shows that M3 was not retained to conduct remediation. Whether or not remediation occurred would have been irrelevant to M3's collection claim, even if it had been litigated rather than resolved by default. We therefore must consider whether Gatward's statements about mold are protected as statements in a public forum about an issue of public interest.

Web sites accessible to the public are public forums. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41, fn. 4 [Yahoo message board].) But defamatory statements are not transformed into issues of public interest merely because they are posted on a Web site. (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 114 [statement on labor union Web site that union manager was fired for financial mismanagement was in a public forum but not connected to an issue of public interest, notwithstanding widespread viewing by union members and a pending governmental investigation into mismanagement of union finances].) Statements about private disputes are not protected by the anti-SLAPP statute. (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132 [publications in trade newsletter accusing a token collector of theft did not involve an issue of public interest and were not protected]; *Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 34 [telemarketing pitch "was about Investor Data's *services*, not about investment scams in general" and was not protected]; *Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, 600-601 [advertising claims for breast enlarging herbal supplements did not concern the general topic of herbal supplements of interest to public and were not protected].)

6.

But statements may be connected to an issue of public interest if they concern a person or entity in the public eye, a topic of widespread public interest, or conduct that could directly affect a large number of people beyond the direct participants. (*Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924 [flyers criticizing custodial staff supervisor did not concern an issue of public interest].) PG Inn is not an entity in the public eye. It owned one bed and breakfast property. The statements did not involve a topic of widespread public interest. They were narrowly focused comments on the Inn's business practices, of interest only to its customers and potential customers, a limited portion of the public. They did not involve conduct that could affect large numbers of people.

"[I]n cases where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public . . . , the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion" to be protected. (*Du Charme v. International Brotherhood of Electrical Workers, Local 45, supra,* 110 Cal.App.4th 107, 119; *id.* at p. 118 [statement was of interest to members of the union but "unconnected to any discussion, debate or controversy," and was not protected].) Gatward offered no evidence of an ongoing discussion about mold or health concerns, his comments were not made in the context of any ongoing discussion about those issues, and his comments were narrowly focused on the Inn without reference to any broader concerns. He wrote, "We were asked to perform mold testing at the [I]nn . . . and found a severe problem . . . . [A]s far as we know, the mold problem still exists . . . ."

Gatward argues that his comments were part of an ongoing discussion about the Inn's services and they were connected to the general health risk of mold exposure, an issue of public interest. We "examin[e] . . . the specific nature of the speech rather than the generalities that might be abstracted from it." (*Commonwealth Energy Corp. v. Investor Data Exchange, Inc., supra,* 110 Cal.App.4th 26, 34.) As the court observed in *Consumer Justice Center v. Trimedica International, Inc., supra,* 107 Cal.App.4th 595, 601, "Trimedica's speech is not about herbal supplements in general. It

7.

is commercial speech about the specific properties and efficacy of a particular product, Grobust. If we were to accept Trimedica's argument that we should examine the nature of the speech in terms of generalities instead of specifics, then nearly any claim could be sufficiently abstracted to fall within the anti-SLAPP statute."

Gatward points out that in *Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1367, criticisms about a dentist posted on Yelp.com were protected because they were made in connection with an ongoing discussion about public health concerns. But in that case, the statements included broad comments on health issues, "general anesthetic harms a kid's nerve system" and "[t]he metallic filing, called silver amalgams [*sic*], has a small trace of mercury in it. The newer composite filling . . . does not. In addition, it uses a newer technology to embed fluoride to clean the teeth for you." (*Id.* at p. 1361.) The defendant also demonstrated an ongoing public discussion about the issue by submitting, "copies of various Web site pages to show that the Internet is an important source of public information about oral hygiene, dentists, and dentistry" and "Web site pages concerning the use of silver amalgam to fill cavities and whether it is safe because it contains mercury." (*Id.* at p. 1362.) A medical journal article and a "data sheet" used by the dentist also described the ongoing public controversy about the use of silver amalgam fillings. Gatward and M3 developed no record of an ongoing discussion or debate here. Gatward's reliance on *Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 425, in which criticisms of apartment building managers posted on Yelp.com "undoubtedly ar[ose] from protected activity," is misplaced because in that case the parties agreed the first prong had been met and the court "'bypass[ed] the initial inquiry.'"

Gatward also relies on *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 382, in which a tenant's statements to prospective homebuyers that a registered sex offender lived nearby were protected although there was no ongoing discussion or controversy in the neighborhood about the offender. But those statements were directly related to a topic of widespread public interest. The *Cross* court acknowledged that the fact that a broad and amorphous public interest can be connected to a specific dispute is not sufficient, but found the statements disseminated information regarding registered sex

8.

offenders and so were directly related to an issue that has been legislatively recognized as being of compelling and widespread public concern. (*Id.* at pp. 378-379; Pen. Code, §§ 290.4, 290.45 ["Megan's Law"].) The court also relied on a line of cases that hold that preventing child sexual abuse and protecting children from sexual predators are issues of widespread public interest. (*Cross*, at p. 375.) It decided that, even if interest in one particular offender was not widespread and concerned only a narrow group of neighbors, the statements would be protected under the *Du Charme* rule because they were made in the context of an ongoing discussion. "[T]he continuous access to and dissemination of information about the presence of a registered offender in the area [on the Megan's Law internet registry] represents ongoing 'discussion,' albeit a cyber discussion, between local authorities and local residents about that particular offender." (*Cross*, at p. 383.) Here, Gatward did not develop a record of a widespread public interest in mold exposure or establish that his statements were made in the context of any ongoing controversy, dispute or discussion about the issue. The fact that there may be a broad and amorphous public interest in unremediated mold does not alone meet the requirements of the statute.

*Probability of Prevailing*

Even if Gatward's statements were protected, he and M3 would not be entitled to relief under the anti-SLAPP statute because PG Inn demonstrated a probability of prevailing on the merits. To satisfy the second prong, a plaintiff responding to an anti-SLAPP motion "'"must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited."'" (*Oasis West Realty, LLC v. Goldman*, *supra*, 51 Cal.4th 811, 820.) We accept as true the evidence favorable to the plaintiff. (*Ibid.*) We do not weigh credibility or compare the weight of the evidence. (*Ibid.*) If the plaintiff can show a probability of prevailing on any part of its claim, the entire cause of action stands. (*Ibid.*)

PG Inn alleged that Gatward falsely stated that a severe mold problem in the Inn's basement was never remediated. It offered proof that Gatward wrote that M3 "found a severe problem," that "management (Jolie Quest) tried to perform their own

9.

remediation, to no good effect," and that "[a]s far as we know, the mold problem still exists . . . ." The statements contain assertions of fact, notwithstanding the phrase "[a]s far as we know." Couching an assertion in the form of conjecture does not render it inactionable, if a fact is implied. (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 902.) And although some Internet rants have been found to be mere opinion, Gatward's statements were not. He implied knowledge of facts as an environmental expert with first-hand knowledge of conditions at the Inn. (*Bently Reserve LP v. Papaliolios*, *supra*, 218 Cal.App.4th 418, 426; *id.* at p. 428 [tenant's post on Yelp contained provable falsehoods and not mere opinions because he "went out of his way to win credibility with his audience" by referring to his "first-hand experience"].)

PG Inn's evidence supports a finding that the gist of these statements was false and that Gatward and M3 knew or should have known they were false. (*Hughes v. Hughes* (2004) 122 Cal.App.4th 931, 936.) M3's reports support a finding that the "significant airborne mold spore concentration" that M3 reported in 2009 was not present in 2010 when M3 reported that "[a]nalytical results of the bioaerosol sampling as well as the visual inspection conducted during this evaluation do not suggest a significant airborne mold spore concentration is still present in [the] basement of the Main Building." The reports and Peterson's declaration provide evidence that remediation efforts between 2009 and 2010 reduced airborne levels of mold spores from levels up to hundreds of times higher than outdoor samples to levels that were below outdoor samples consistent with a well-maintained building. On November 18, 2009, M3 found 1,100,000 spores per cubic meter in a basement air sample as compared to 1,800 outside. In 2010, it found that "spore concentrations found in the indoor areas were lower than outdoor" concentrations in all samples. Gatward points to evidence that mold remained visible in 2010 in two places and that a sink was clogged. M3 noted these facts in 2010 and nevertheless concluded that visual inspection and sampling "do not suggest a significant airborne mold spore concentration is still present." We do not weigh the probative strength of competing evidence. PG Inn's evidence is sufficient to sustain a jury finding that the gist of Gatward's statements was untrue.

Gatward and M3 contend that PG Inn has presented insufficient evidence of special damages to prevail on a claim for trade libel.  Even assuming proof of damages is required and that Gatward did not forfeit the contention when he did not raise it in the trial court, the declaration of Peterson concerning lost revenues is sufficient to sustain PG Inn's burden at this stage.  The plaintiff's burden to establish a probability of prevailing on its claim must be compatible with the early stage at which the motion is brought and the parties' limited opportunity to conduct discovery.  (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 823, disapproved on another ground in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5.)

DISPOSITION

The judgment is affirmed.  Respondent shall recover costs on appeal.

NOT TO BE PUBLISHED.



GILBERT, P.J.

We concur:


YEGAN, J.


PERREN, J.


11.

Rebecca Susan Riley, Judge

Superior Court County of Ventura

_____


Gordon & Rees, LLP, Peter Schwartz, David L. Jones, Gary A. Collis for Defendants and Appellants.


Law Office of Megan DeZotell, Megan DeZotell for Plaintiff and Respondent.